VENNER v. FARMERS' LOAN & TRUST CO. OF NEW YORK.

ADRIAN WATERWORKS CO. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. November 19, 1898.)

Nos. 570, 571.

1. CORPORATIONS—REORGANIZED WATER COMPANY—RIGHTS OF BONDHOLDERS.
A new corporation was organized to succeed an insolvent water company, and to acquire its property and franchises, which it did through a purchase at foreclosure sale, issuing its bonds, some of which were exchanged for the bonds of the old company. The intervening petitioner, who was the organizer and practically the owner of the new company, was a creditor of the old company, whose claim had been adjudged in the foreclosure suit a lien superior to that of its mortgage bonds. He became the purchaser of the property at the sale under the decree, subsequently conveying to the new company. Held, that the new company was legally a new and distinct corporation from the old, as to its bondholders, whose bonds, though acquired by exchanging therefor bonds of the old company, were not subject to the intervener's lien which was presumptively discharged by the foreclosure sale, and that they were not bound by an agreement between the intervener and the new company that his lien should continue as a first charge on the property in the nature of a vendor's lien, of which agreement they had no notice.

2. SAME—MORTGAGE COVERING AFTER-ACQUIRED PROPERTY.
A new corporation, organized for the purpose of acquiring the property and franchises of an insolvent water company through purchase at foreclosure sale, issued and sold its bonds, secured by mortgage, before the purchase of the property. The mortgage described but a small amount of property then owned by the corporation, but recited that the bonds were issued for the purpose of acquiring the waterworks property and franchises, and contained an after-acquired property clause. Held, that the mortgage covered the property of the old company when acquired by the purchase, without the necessity of a supplemental mortgage describing the same.

**3. SAME—EFFECT OF COVENANT FOR FURTHER ASSURANCE.**

An after-acquired property clause in a mortgage given by a corporation, which recites that the bonds secured are issued for the purpose of acquiring additional property, is not rendered ineffective as to such property when acquired by a covenant for further assurance, by which the mortgagor binds itself on demand to execute such further conveyances or mortgages as may be necessary to carry the objects of the mortgage into effect.

**4. SAME—VENDOR'S LIEN.**

An after-acquired property clause in a mortgage made by a corporation can only take effect as to property subsequently acquired by the mortgagor subject to a vendor's lien thereon, which is valid as against the mortgagor, unless there are reasons which render the enforcement of such lien inequitable as between the vendor and the mortgagees.

**5. SAME—ESTOPPEL TO ASSERT LIEN.**

A creditor of a water company whose claim had been adjudged in foreclosure proceedings a superior lien to that of its bondholders organized a new company to purchase its property and franchises. He was in fact the owner of all of its stock, and received the entire issue of its bonds, made to effect the purchase of the property, and secured by a mortgage reciting such purpose, and containing an after-acquired property clause. These bonds he sold and exchanged for bonds of the old company on representations that they were good securities, and would constitute the first lien upon the property. He purchased the property at the foreclosure sale, and conveyed it to the new company. A portion of the proceeds of the bonds he diverted to unauthorized purposes. *Held* that, as against the bondholders, he could not assert a vendor's lien on the property for the amount due from the old company which was applied towards the purchase at the foreclosure sale, and, as he claimed, had never been repaid.

**6. SAME—BONDS—PAYMENT OR PURCHASE OF COUPONS.**

In order to constitute a sale rather than a payment of coupons from the bonds of a corporation, which by the mortgage are preferred over the bonds themselves, the holder must have intended a sale; and where they are cashed by a banker having an interest in maintaining the credit of the corporation, and the amount is received by the holder in the belief that the coupons are being paid, they will be treated as paid and canceled.

Appeals from the Circuit Court of the United States for the Eastern District of Michigan.

This case is an appeal from a decree dismissing the intervening petition of the appellant, Charles H. Venner, filed in a mortgage foreclosure proceeding, wherein the Farmers' Loan & Trust Company was complainant, and the Adrian Waterworks Company was sole defendant. The object of the foreclosure suit was to enforce a mortgage made August 1, 1888, by the waterworks company to the Farmers' Loan & Trust Company, as trustee, to secure an issue of 200 bonds of $1,000 each, with interest coupons maturing semiannually. There was default in payment of interest, which precipitated the payment of the principal. Venner intervened in this suit for the purpose of asserting a claim of lien against the property of the waterworks company, superior to the lien of the mortgage, being foreclosed. The averments of his petition were substantially as follows:

(1) That in 1883 the municipal council of the city of Adrian, Mich., in pursuance of chapter 84 of Howell's Annotated Statutes of Michigan, passed a resolution declaring that it was expedient to have constructed works for supplying the city with water, but that it was inexpedient for the city to build such works. Thereupon, one Solon L. Wiley and his associates organized a corporation, in pursuance of the authority conferred by the statute recited above, for the purpose of supplying said city with water, called the Adrian Michigan Waterworks, hereafter called the "Old Company." The said company, after due organization and the acquisition of the supposed necessary site, made a mortgage upon its property to secure means to carry

out its purposes by an issue of 7 per cent. bonds, aggregating 145 of $1,000 each, interest payable semiannually, with the ordinary provision for foreclosure in default of payment of either interest or principal.   The trustee in this mortgage was the Boston Safe & Deposit Company.   It is then averred that this old company entered into a contract with the city of Adrian to supply it with water.   In the performance of this contract, bitter disputes arose between the company and the city, which resulted in a supplemental contract, made in November, 1887.   It is then averred that no interest was ever paid on the bonds of said old company, and that in March, 1888, the trustee under the mortgage instituted foreclosure proceedings in the circuit court for the Eastern district of Michigan, and took possession, as mortgagee, of the property and works of the company, and continued to operate the same, and collect rentals and water dues from the city of Adrian and individual consumers until final foreclosure sale, in 1891.   Petitioner then charges that neither the said old company nor the said mortgagee in possession had the means to make the extensions and improvements necessary to carry out the supplemental contract with the city, and that he was applied to, to furnish the money, and did supply the money, and procured and constructed the necessary plant, machinery, and reservoirs, "under an arrangement with the said Boston Safe & Deposit Company," by which the money so supplied was to be a preferential claim in the said foreclosure proceedings, and first paid out of the proceeds of sale, and by which the costs of all such additions and improvements were to be a first lien, not only upon the additions and improvements, but upon all the property of the said old company, in preference to said mortgage so being foreclosed.   It is further averred that this arrangement was submitted to the said circuit court, and was approved and sanctioned by a decree of date November 6, 1890, ordering a sale of said mortgaged property, including the additions and improvements made by said Venner, and that out of the proceeds of sale the moneys so expended by said petitioner should be paid in preference to the claims of the mortgage bondholders.   The cost of the said Venner plant, as fixed by said decree, was $41,217.18.   In addition to this, petitioner avers that he furnished "to the master in chancery in said suit about $20,-000, with which to pay taxes and other necessary expenses, which sum was also agreed between said Boston Safe & Deposit Company and this intervener, to be also a lien prior to the said bond issue and a senior incumbrance upon said property.

The petition then proceeds as follows: "(7) Prior to the making of the said decree in the said foreclosure suit in this court, and in anticipation of the sale which would be made under it, it was determined by all parties concerned to reorganize the said mortgagor corporation, in order to refund the bonds at a lower rate of interest and to make provision to fund the interest which was unpaid, and to pay interest upon a new bond issue, which would take the place of the said former bond issue; and thereupon it was arranged by and between this intervener and all parties concerned that he should take up and carry through the said scheme of reorganization.  (8) To that end, it was arranged that this intervener should act as trustee and agent for all parties concerned, and should buy in the said mortgaged property at the foreclosure sale in this court, and should convey it to a successor corporation, which should be organized under the said chapter 84 of Howell's Statutes, which successor corporation should issue two hundred twenty-year 6 per cent. bonds, to be exchanged for the old bonds, which were 7 per cent., issued by the original corporation to the extent of one hundred and forty-five, the remaining fifty-five new bonds of the successor corporation to be used to provide funds to pay the said overdue interest upon the issue by the original corporation, and to pay the interest upon the new bonds of the successor corporation until it should be in condition to pay interest out of earnings: and it was agreed that the said new bonds of the successor corporation should stand in the shoes of the old bonds of the original corporation with respect to being junior to the equitable lien of this intervener for the money representing that which was supplied by him as aforesaid to make the mortgaged property of value, and to give it running power, and to enable it to perform its duties to the public, in accordance with the intent of the statute aforesaid."

It is then averred that "this scheme of reorganization was substantially

according to the reorganizing provisions of the General Statutes of Michigan": that articles of incorporation were duly drawn and signed, with same capital stock as original corporation; that the subscribers to said capital "were mere dummies," having no intention or means to pay: and that "nothing was ever paid or intended to be paid," all parties regarding the new organization "as the same as the original"; and that no new corporation could be validly organized, no new resolution having been passed by the council of Adrian, which the petition claims was an essential prerequisite to the valid organization of any new waterworks corporation; under chapter 84, How. Ann. St. Mich. This new company was organized July 24, 1888, and was called the Adrian Waterworks Company, but will hereafter, for brevity, be called the "New Company." It is then stated that, acting upon "the theory that the successor corporation was the original corporation," a new mortgage was made, the one now being foreclosed. It is stated that the only property held by the new company when it made said mortgage was a piece of land known as the "Lawrence Land," purchased and paid for by petitioner Venner, "not adapted for waterworks, and distinct from the actual waterworks of the original corporation, and never used or intended to be used for waterworks." The mortgage thus made bears date August 1, 1888, and secured the issue of $200,000 in bonds heretofore more specifically described. It is then averred that in January, 1891, petitioner, "acting as agent and trustee for the original and successor corporations, and for both sets of mortgagees and bondholders, thus carrying out the plan of reorganization, bid in all the said waterworks plant at the foreclosure sale by the Boston Safe & Deposit Company against the original corporation," for $127,000, and paid for same with the securities of the old company in part, and the remainder in money, and by receipting the master for the preferential sums allowed him under the decree of sale. The securities of the old company thus used, the petition says, consisted in bonds and coupons secured by the foreclosed mortgage held by him "as trustee," having been procured in 1888 in exchange for the bonds of the new company. Two days after receiving a conveyance from the master, petitioner avers that, "to carry out the said plan of reorganization," he conveyed the said property, by quitclaim deed, to the new company. He avers that "no consideration was agreed to be paid by the successor corporation to this intervener, and no consideration was actually paid by the successor corporation to this intervener for the said property and franchises, because it was understood by all parties concerned that the said conveyance was a mere form to carry out the scheme of reorganization, and that the senior incumbrance of this intervener still remained upon the said property in the hands of the successor corporation receiving said quitclaim deed. The successor corporation took the said property and franchises conveyed to it by intervener, charged with this intervener's equitable lien and senior incumbrance; and when the said property and franchises passed under the Farmers' Loan & Trust Company's mortgage, if they did ever pass under said mortgage, they did so pass being so charged with the said senior incumbrance of this intervener's senior incumbrance and equitable lien."

Concerning the bonds issued by the new company, the petitioner states that the entire issue of bonds was received and disposed of by him. He says that they were placed in his hands by the new company, "to be used in the purchase of the bonds of the original corporation, or in exchange for them and the overdue interest coupons thereupon, and also for the interest on the bonds of the successor corporation, which uses absorbed the entire issue of 200 bonds; and the said bonds were so applied to the said uses by this intervener, and by no one else, and in conformity to the said plan of reorganization." Concerning notice of the alleged agreements under which petitioner claims to have acted, the petition avers: "The said bondholders represented in this suit by the Farmers' Loan & Trust Company had full notice of all the foregoing statements in this petition of intervention—First, by their transactions with this intervener, who received every one of said bonds from the complainant, and placed them where they are now held by exchange as aforesaid: secondly, by the provisions of the governing statute hereinbefore referred to as chapter 84 of Howell's Statutes, and particularly of section 2 and section 18; thirdly, by the recitations in the articles of incorporation

of the successor corporation hereto attached as Exhibit A; fourthly, by the recitations in the mortgage itself, executed by the successor corporation to the complainant in this cause; and, fifthly, by the decree in the said foreclosure of the Boston Safe & Deposit Company, of record in this court, in the foreclosure against the original corporation. Said notice informed said bondholders and said complainant in this suit that the said bonds must be regarded as those of the original corporation, and must be held as junior to this intervener's incumbrance, or were otherwise wholly void, and not valid and subsisting securities in the law. But the intervener is advised and submits that notice was unnecessary."

The claims of petitioner, as stated in an exhibit filed as part of his petition, are as follows:

| | |
|---|---|
| Item No. 5. (Trustee.) All advanced by C. H. Venner........ | $10,525 35 |
| Item No. 6. (C. H. V.)..................................... | 43,738 29 |
| | |
| Includes interest to June 22d, 1891......................... | $54,263 64 |
| Add int. at 6 per cent., June 22d to Aug. 10, 1891............ | 452 20 |
| Paid master in cash, Jany. 6th, 1891....................... | 12,700 00 |
| Interest on same, at 6 per cent., to Aug. 10th, 1891.......... | 453 00 |
| Paid master in cash, Aug. 7th, 1891........................ | 6,948 91 |
| | |
| | $74,817 75 |

The prayer of the petition was that the petitioner might intervene and become a party to the suit, and that the said Farmers' Loan & Trust Company and the Adrian Waterworks Company should be required to answer and defend his said claims, and that his claims should be declared a lien, superior in rank to that of the mortgage. Petitioner was admitted as a party, and both the Farmers' Loan & Trust Company and the Adrian Waterworks Company answered. The answer of the mortgagor company conceded the claims of intervener, and admitted the truth of all his averments. The Farmers' Loan & Trust Company, the mortgage trustee, put in issue every substantial averment, denied any agreement whatever with petitioner, and all notice of his claim to either itself or the bondholders secured under the trust to it. A vast amount of evidence was taken, and the whole case heard finally upon the pleadings and proof by the circuit court, which, without a written opinion, denied all relief to petitioner, and dismissed his petition.

Alfred Russell, for appellant, Venner.

Henry M. Campbell, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The claim of Venner is that he is entitled to priority of payment out of the proceeds resulting from the foreclosure of the mortgage made by the Adrian Waterworks Company to the Farmers' Loan & Trust Company. He endeavors to maintain his claim to a lien superior to the mortgagees—First, upon the ground that in all he did in respect to the improvement and enlargement of the old waterworks plant at Adrian, as well as in the procurement of the decree of foreclosure in the old foreclosure case against the old company, wherein his claim was given preference over the old 7 per cent. mortgage, he was acting as "the agent and trustee of the old and new company, of both mortgagees, and both sets of bondholders." When he bought the property sold under the old foreclosure decree, and conveyed it to the new company, he says he was acting still as the agent of all parties, and un-

der a distinct agreement that his expenditures in procuring the title through the old foreclosure proceedings should be returned to him, and constitute a first lien upon the property of the new company superior to the mortgage made by that company. If Venner is to be accorded a lien and priority over the mortgagees of the Adrian Waterworks, it must be either because he has shown a valid contract and agreement for such lien between himself and the mortgagees directly, or by some one authorized under the circumstances to bind them, or some implied lien in the nature of a vendor's lien, which arose out of the facts and circumstances of the transaction, and which takes precedence over the mortgage.

First. Was there any contractual lien? The claim that the new and old corporations are identical legal entities, the former being nothing more than the latter under a change of name, cannot be sustained as to third parties who are bona fide holders of the securities of the new company. What occurred was in one sense a reorganization. But the new corporation is legally a new and distinct corporation. New articles of incorporation were subscribed, and a new corporate organization perfected. That the new company was formed for the purpose and in the expectation of acquiring, through purchase, the property and franchises of the old waterworks company, and that it did finally become the owner of that property and the franchises of the old company, does not affect the distinctness of the new corporation. That bondholders of the old company exchanged their securities for bonds of the new company, does not affect the question. By such exchange they ceased to be creditors of the old and became creditors of the new. That the stock subscribed in the new company was subscribed by persons who neither expected nor were able to pay their subscriptions, was a fraud upon the public, as well as upon the creditors of that company; but it does not affect the fact of incorporation as to those who dealt with it as a corporation. Neither do we find any organic difficulty in its organization, growing out of chapter 84, How. Ann. St. Mich. The original action of the city council, in 1883, stood unrepealed when the company was organized. That conferred no monopoly upon the old company. If that company was unable to go forward and supply the city with water, we see no difficulty in a new company being organized to take over its contract and franchises in the way this company proposed to do. Neither the new company, nor its mortgagees, were parties to the old foreclosure suit, and neither were bound by the decree giving to Venner a lien or establishing his debt, unless they were under some contract and relation to Venner by which he was, in fact, their agent or trustee in all that he did in that cause, or unless the property acquired by the new company through Venner's conveyance was, at the time the title was obtained, subject to some lien in his favor, which is equitably entitled to precedence over the mortgage. The evidence wholly fails to establish the contention that Venner was the agent or trustee of either the trustee under the mortgage of the new company, or of the bondholders secured by that mortgage. That Venner advanced moneys to make additions to the plant of the old company at the request of the Boston Safe & Deposit Company, under an agreement that these

additions and improvements should be added to the plant and property of the old company, and that such advances should be repaid out of the proceeds of foreclosure, may be conceded. The decree in the old case settled that, and all the parties to the suit in which that decree was pronounced are bound by that decree. But a foreclosure occurred under that decree. Venner became the purchaser at a price more than sufficient to repay himself for all advances, as well as to pay all sums entitled to priority over him, and all taxes and other charges against the property entitled to preference over the indebtedness secured under the old mortgage. It may be conceded that no part of the claim of Venner was actually paid to him in money. But Venner applied that which was due him out of the proceeds of sale, as well as that which was due to him as the "agent or trustee" for the new company, towards the satisfaction of his own bid, paying in money only such part of the price as was necessary to meet the costs and expenses of the cause and of the trustee, and that which was due to other creditors, including taxes due on the foreclosed property.

Obtaining a clear deed to the property, he at once conveyed it by a deed, which contained no warranty, and reserved no lien for his own security, to the new company. He says he made this deed as a mere matter of form, in order to carry out the original scheme of reorganization, and that "all parties" understood that the lien which had been declared in his favor by the decree of foreclosure in the old case should continue and remain a first lien, and rank superior to the mortgage lien of the new company. If by "all parties" Mr. Venner intends to include the trustee and bondholders of the mortgage of the new company, he is not supported by the evidence. Neither the trustee under that mortgage nor the holders of the bonds of the new company were consulted about any of his proceedings, and gave no consent to any of his claims, directly or indirectly. But it is said that the existing mortgage of the new company did not include the property thus deeded to the mortgagor, and that, to affect this property by that mortgage, a supplemental mortgage was necessary, which was never made. As a corollary from this, appellant says that it is only necessary to show an agreement for a lien between the new company and Venner, or such a state of facts as will give rise to an implied vendor's lien good against the new company in order to entitle him to the relief he seeks as against the property not included in the mortgage. The foundation of this argument fails. No supplemental mortgage was necessary. There is an after-acquired property clause in the mortgage, by virtue of which the property was subjected to the lien of the mortgage. That mortgage, after reciting that the object of the mortgagor was to issue bonds to raise money to buy the property and plant of the Adrian, Mich., Waterworks, and the procurement of such additional property and plant as should be necessary to enlarge that plant, sets out the resolution of the stockholders authorizing the making of the instrument, and directing that a mortgage be made "of all its property, real, personal, and mixed, income and choses in action, * * * both that which it now owns and all that which it may hereafter at any time, until the payment and discharge of the whole of said indebtedness, principal and interest, in any place, acquire."

The conveying clause of the mortgage is in accord with this direction and authority. It conveys by description certain lands, "and all its privileges, franchises, easements, choses in action, estate, property, real and personal, effects, and assets, which the said first party now has, or at any time hereafter during the existence of this mortgage acquire, whether or not the same be mentioned herein." It is true that there is a subsequent covenant for further assurance by which the grantor became bound upon demand to execute such other and further deeds, assignments, or supplementary mortgages as might be necessary to carry into effect the objects of the mortgage. No demand was ever made for such other or further conveyances. But the presence of this covenant did not defeat the usual and proper effect of an after-acquired property clause, which operates as an executory agreement, and attaches itself to the property when acquired.

But it is insisted that, if the property did pass under the mortgage under its after-acquired property clause, it did so subject to a lien in favor of Venner, to secure him as the vendor of the property, in the payment of its purchase price. If the mortgagor had no title, legal or equitable, until Venner made his deed, and the property passed under the mortgage only by virtue of the after-acquired property clause thereof, and there was a valid subsisting lien thereon for purchase money due Venner, it may be conceded that such vendor's lien would continue a prior and superior lien to the mortgage, although actually subsequent thereto in point of time. Irrigation Co. v. Garland, 164 U. S. 1–16, 17 Sup. Ct. 7; Harris v. Bridge Co. (decided at the present term of this court) 90 Fed. 322. This is the aspect of this case which, apparently, has most merit, and has been most pressed upon us as affording ground for a decree enforcing a lien in appellant's favor. The lien of a vendor is a mere creature of equity. It rests upon the principle that, when one gets the estate of another, he ought not to keep it without paying the consideration. Chilton v. Braiden's Adm'x, 2 Black, 458; Gold Mines v. Seymour, 153 U. S. 509, 14 Sup. Ct. 842. Since the implied lien of a vendor is only permitted as a security for the unpaid purchase price, it is incumbent upon appellant to show that that which is due him from his grantee, the Adrian Waterworks, is in fact the purchase price of the conveyed property, for the implied lien of a vendor will not arise out of any general indebtedness or other liability at large. 3 Pom. Eq. Jur. § 1251. Neither will such an implied lien be enforced when it would operate as a means of deception or in prejudice of good faith to those affected by it. McGonigal v. Plummer, 30 Md. 422.

Tested by these principles, we reach the conclusion that the consideration for the conveyance made by appellant to the mortgagor corporation does not constitute such a consideration as to give rise to such an equitable lien as should be enforced to the prejudice of the mortgagees of his grantee. This conclusion we reach chiefly by reason of the relation of Mr. Venner to the mortgagor company, and his active connection with the negotiation of the bonds of that company. In the first place, Venner and the new company, his grantee, are equitably and substantially identical. He organized it. The stock subscribers are styled by his counsel as mere "dummies," who never

intended to pay, and were not able to pay. That stock, when issued, was all transferred to him. He conceived the scheme of an issue of bonds by his company to be used in acquiring the property and plant of the old company, and certain additions to that plant, which he was then in the course of procuring, under an agreement with the mortgage trustee of the old company. Having no property which could be made the basis of a mortgage, he bought a useless piece of land for $5,000, and conveyed it to this new child of his loins. That property, confessedly worthless for waterworks purposes, is conveyed with much flourishing of phrases touching water rights, etc., and was the sole property actually owned by the mortgagor, or described or conveyed in the mortgage to the Farmers' Loan & Trust Company, for the purpose of securing an issue of $200,000 of the bonds of the new company. Resting only upon that as security, the bonds were worthless, and this Venner knew. Substantial security could only be given to them by using them to purchase the plant of the old waterworks company and the additional plant which he had already planned when these new bonds were issued. That this was to be the use made of these bonds appears upon the face of the mortgage. That instrument recited that $150,000 was needed to purchase the plant, property, and franchises of the old Adrian, Mich., Waterworks, and $50,000 to procure additional property and plant to be added to that. Turning to the original resolution, passed by the "dummy" stockholders, authorizing this mortgage, we find that this new or additional plant to be purchased is described as one in course of construction by Venner. Thus, the mortgage contemplated that these new bonds were to be used to secure a property and plant which should pass under the mortgage through the after-acquired property clause thereof so soon as acquired, and that such other and further deeds, assignments, or supplemental mortgages should be made as would give full effect to the declared purpose of securing these bonds upon the property to be thus acquired, with the proceeds of the bonds secured thereunder. This mortgage was made August 1, 1888, three years before he conveyed these identical properties to that company. All of these bonds came to Venner's hands, and were disposed of by him. He was a banker, a member of the firm of C. H. Venner & Co., engaged in business in Boston, Mass. At that time, and for some time thereafter, he stood high in financial circles. His recommendation of a bond made it "go," gave it standing, and secured buyers. He had floated the bonds of the old company, and had maintained their standing by "taking up" the interest coupons through his bank, either with his own means or that of another equally interested in maintaining their market value. Thus related to the old bonds, he undertook to negotiate the new. He says that the company placed these latter bonds in his hands, to be used in exchange for the bonds and "overdue coupons" of the old company, and to pay himself for the Lawrence land, and to provide means for the payment of interest upon the new bonds as coupons should mature, and that these uses have entirely consumed them, leaving himself unpaid for part of the cost of the property of the old company and of his additional plant.

Great weight must be attached to the substantial oneness of Ven-

ner and the new company. It will not do, under the facts of this case, for Venner to say that the new company had a right to determine the purposes to which its bonds should be applied. Any diversion of these bonds from the declared purposes of the mortgage, and to the prejudice of the purchasers of these bonds, would be in bad faith to them. Its action was his action. The circumstances under which these bonds were negotiated by Venner, and a substantial identity of Venner and the mortgagor, place both under the highest obligations to acquire, with their proceeds or by their use, the properties which, according to the resolutions of the stockholders and directors as recited in the mortgage, were to be acquired by means of the bond issue of the mortgagor company. Through the honest and faithful use and application of these bonds or proceeds, the security which the mortgage contemplated could have been acquired subject to no lien superior to the lien of the mortgage. Chief among the circumstances bringing Venner under this obligation were his representations to those who obtained their bonds from him, either by exchanging old bonds for those of the new company, or who bought such bonds outright.

To induce holders of the old bonds to give them in exchange for the bonds of the new company, he is shown by the testimony of many witnesses to have represented that they were "good bonds," resting on "good security," "were a first mortgage," and "better bonds than the old bonds." Like representations were made to purchasers, and such confidence was placed in his honor and integrity that these bonds, worthless as they were in respect to a then-existing security, were in many cases sold by him at a premium. His statement that he explained to such persons that his claim for advances then made or to be made by him, in the procurement of the additional plant, would constitute a lien superior to that of the mortgage, is unconfirmed, and is incredible. Such persons as now hold the bonds under foreclosure, who have been examined, flatly contradict him, and say that he represented the bonds as "a first mortgage" and a good security, and said nothing as to such a claim in his own favor. It may be conceded that the persons taking these new bonds are chargeable with constructive notice of all which would have appeared by an examination of the recorded mortgage. This constructive notice would not, however, defeat his liability to all who relied upon his representations, without personally seeing to the character of the security actually provided by the mortgage.

But, if the purchasers had constructive notice that the mortgagor did not, at the date of the execution of the mortgage, own any property other than the valueless Lawrence land, they also had notice that the mortgage was made for the purpose of securing bonds to be used in acquiring the plant and property of the old company and the additions thereto being made in order to enlarge that plant, and that these properties, when acquired, would pass under the mortgage by virtue of its after-acquired property clause. That this use should be made of the new bonds or their proceeds they had a right to expect. Venner's relation to the mortgagor company, and his own representations to those who took from him these bonds, were such as to make it inequitable

that he should do or permit anything which would defeat the purposes of. the mortgage or conflict with his own statements that the bonds would be a first lien and the mortgage a good security.   He cannot, under the circumstances of this case, be heard to set up any secret contract or agreement between himself and the mortgagor which would defeat the reasonable expectations of those who took these bonds upon his recommendation.   Neither should he, by his conduct, be suffered to profit personally by ·any diversion of these bonds' or their proceeds from the objects to which both the mortgagor and himself were bound to devote them.   Let us see how he disposed of the bonds so issued to him.   One hundred and twenty of them he used in exchange for a like number of the bonds of the · old company.   That was within the purpose of the mortgage.   This leaves 80 to be accounted for. These, he says, were applied in paying himself for the Lawrence land some $5,000.   This was not permissible.   That claim constituted no lien, and was but a general debt against the company, and cannot be discharged out of the fund which should have been applied so as to enlarge the security of the mortgagees.   He applied about $20,000 in the payment of interest upon the new bonds.   This was a diversion. His claim for money so advanced to the new company is a claim not in the nature of a vendor's lien, and he cannot be allowed to displace the lien of the mortgage by diverting the bonds in his hands to repaying himself for such expenditures.   He says he used some $57,000 in purchasing from himself overdue coupons detached from the bonds of the old company.   If the coupons were, in fact, unpaid, they were a proper outlay of the bonds of the new company, for interest was preferred over principal under the mortgage of the old company, and they would be preferential claims to be used in acquiring the mortgaged property of that company.   But, under the circumstances of this case, we think it incumbent upon Venner to establish in the clearest way that these coupons were a valid and subsisting lien, enforceable under the old mortgage.   These coupons matured between July 1, 1883, and July 1, 1888.   More than half of them are punched, the usual way of canceling a paid coupon.   These punched coupons, aggregating about $30,000, were obtained by Venner from one S. E. Wiley, in 1889.   Wiley does not remember the details of the transaction.   He says his books would show, but declined to produce his books or a statement therefrom.   These were transferred to Venner on a settlement between them, and that is all he will tell about it. Wiley says he furnished the money to C. H. Venner & Co. to "purchase" the maturing coupons of July 1, 1883, to July 1, 1886, and in that way became the owner.   Wiley was deeply interested in maintaining the credit of bonds of the old company.   He was the old company in substance.   He held all, or nearly all, of its stock.   He built its works, presumably for its bonds.   Venner, too, was interested in maintaining the credit of the old bonds for a time at least.   He had floated them, and says he furnished the means to "buy" coupons when Wiley ceased to do so.   So far as these punched coupons are concerned, they must be ignored.   The presumption that they were paid is so overwhelming that we shall not deal longer with them.   Farmers' Loan & Trust Co. v. Iowa Water Co., 78 Fed. 881; United Water-

works Co. v. Farmers' Loan & Trust Co., 49 U. S. App. 493, 27 C. C. A. 92, and 82 Fed. 144.

As to the remainder, the presumption of payment arises only from the circumstances under which Venner acquired them. The evidence in this record from such holders of the old bonds as have been examined leaves no doubt in our minds that the original holders of none of these coupons "cashed" over the counter of C. H. Venner & Co. understood that they were selling them, or that they intended to sell them. The persons thus testifying constitute a considerable per cent. of the original holders of these old bonds. They say they had no intent to sell, and supposed the coupons were being paid. In some instances their maturing coupons were deposited for collection with the bank of the holder; in others, they were presented for payment over the counter of C. H. Venner & Co., and paid, as they supposed. All of the original holders of such coupons have not been examined. Many are unknown. But enough have testified to establish the manner in which C. H. Venner & Co. were accustomed to "take up" these coupons. The evidence is sufficient to overturn the direct evidence of Venner that he bought them from the holders. It is not probable that such holders would sell their coupons. Under the mortgage, coupons were preferred to the principal of the bonds. Thus, the value of the common security was being all the time diminished, so far as it was intended to secure the principal of the bonds, by every sale of an interest coupon by the holder of the bond from which it was detached.

It may be true, as stated arguendo by Justice Strong in Ketchum v. Duncan, 96 U. S. 659–662, that:

"Interest coupons are instruments of a peculiar character. The title to them passes from hand to hand by mere delivery. A transfer of possession is presumptively a transfer of title. And especially is this true when the transfer is made to one who is not a debtor, to one who is under no obligation to receive them or to pay them. A holder is not warranted to believe that such a person intended to extinguish the coupons when he hands over the sum called for by them, and takes them into his possession. It is not in accordance with common experience for one man to pay the debt of another, without receiving any benefit from his act."

But it is equally true that mortgages preferring interest over principal afford peculiar facilities to those connected with failing corporations to obtain most unjust advantages over the holders of bonds, by the pretended purchase of coupons which the bondholder would not part with, to the prejudice of his bond, if he had known that the transaction by which his coupon was "cashed" was not a payment, but a sale. It is therefore a sound principle of law that the holder must intend a sale, and consent to a sale, and a mere transfer of title, when he parts with such preferred coupon, or the transaction will be treated as a cancellation and payment. The true doctrine is that announced in Ketchum v. Duncan, supra, that "it is essential to a sale that both parties should consent to it," and that "where a sale with payment is prejudicial to the holder's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal of the debt, the intent to sell should be clearly proven." To the same effect are Farmers' Loan & Trust Co. v. Iowa

Water Co., 78 Fed. 881, and United Waterworks Co. v. Farmers' Loan & Trust Co., 49 U. S. App. 493, 27 C. C. A. 92, and 82 Fed. 144.

The facts of the case bring it closely within Wood v. Safe-Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131. In this case, as in the case cited, there is much to lead one to believe that it was to the interest of both Wiley and Venner to apparently sustain the credit of the old bonds, and much to indicate that while doing so they were both secretly preparing to wreck the old company when the time should be ripe. We may say of Venner, touching the whole series of his dealings with these two companies and their mortgagees, as was said by Justice Lamar in Wood v. Safe-Deposit Co., supra: "It looks very much as if he had dug a pit, and was anxiously keeping the pathway to it in good order." Into this pit he has fallen, and must there lie. It would be grossly inequitable to suffer him, upon the evidence in this record, to apply the funds in his hands to the purchase from himself of coupons obtained as he obtained these, when, by applying those funds as good faith required him to do, he could have discharged any and every obligation to himself growing out of his expenditures in the procurement of the property, which he and his company were under obligation to do. This claim is so tainted with fraud, and so inconceivable, as respects the mortgagees of the new company, that we have no hesitation in affirming the decree of the circuit court.